# THE PEOPLE OF THE STATE OF ILLINOIS, *ex rel.*
## O. H. MINER, Auditor, etc.
### *v.*
# EDWARD S. SALOMON, County Clerk of Cook County.

1. MANDAMUS—*nature of—open to all the modes of pleading applicable to a declaration.* An alternative mandamus is in the nature of a declaration, and is open to all the modes of pleading applicable to a declaration, the allegations of which may be traversed, confessed and avoided, by setting up facts which go to avoid its effect, or a question of law upon the facts stated, may be raised by demurrer.

2. SAME—*of the return.* Where the return to an alternative mandamus against an officer, to compel him to perform a certain official duty required by law, traverses no fact alleged in the writ, and confesses none, except the defendant's refusal to perform the duty required, alleging the act of the legislature requiring such performance to be unconstitutional and void: *Held,* that the whole question involved, that is, the validity of such act, was fully presented by the return, with or *without* a demurrer by the relator.

3. CONSTITUTIONAL LAW—*unconstitutionality must be clear.* The opposition between the law and the constitution must be clear and strong, otherwise, the law will be upheld. The presumption that the legislature have committed an unwarranted act will not be indulged; the fact must be clearly established. ·

4. SAME—*concerning the act of 1867 amendatory of the revenue laws.* The act of 1867, entitled "An act to amend the Revenue Laws, and to establish a State Board for the Equalization of Assessments," is not unconstitutional.

The facts are fully stated in the opinion.

Mr. R. G. INGERSOLL, Attorney General, and Mr. S. D. PUTERBAUGH, for the relator.

Messrs. BECKWITH, AYER & KALES, for the respondent.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court:

This was an application by the Auditor of Public Accounts of this State, for a mandamus against the County Clerk of Cook county, to compel him to extend on the books of the collectors of that county, the equalized tax ordered by the State Board of Equalization.

By the alternative writ the clerk was commanded, in preparing the books for the collectors of taxes, to provide therein five columes for values, specifying what the first and second columns should contain; and that he should extend in separate columns, State, county and all other taxes, against the equalized valuation according to the Auditor's certificate which the clerk had received, in which was set forth the action of the Board of Equalization in respect to Cook county; and in all cases of extension, when the equalized valuation should happen to be fractional, to reject all fractions falling below fifty cents; and that he should extend all fractions of fifty cents or more, as one dollar; and that when the collector's books were completed, he report to the Auditor the valuation as equalized, and the amount of State, county and other taxes

charged thereon, and that he make to each collector a certificate of the rate of deduction or addition determined by the Board of Supervisors in the township to which such book should pertain, as required by sections eleven and fifteen, of the act entitled "An act to amend the Revenue Laws and to establish a State Board for the Equalization of Assessments," approved March 8, 1867, and to do and perform all such acts and things in the premises as the law requires, or appear before the Supreme Court forthwith, to show cause why he refused so to do.

Accompanying the petition of the Auditor were the proceedings of the Board of Equalization, and this notice, directed to the clerk, and issued from the office of the Auditor, and bearing date October 14th, 1867: "Sir:—You are hereby notified that the State Board of Equalization, at their session begun on the first Tuesday, being the first day of October, 1867, determined the rate of 24 per cent. to be added to the assessed valuation of all property listed for taxation in the county of Cook for the year 1867. You will, therefore, in, pursuance of law, proceed to extend the equalized valuation of all property so listed, by increasing the valuation, as equalized by the Board of Supervisors, at the rate of 24 per cent."

The clerk made a formal and elaborate return to the writ, in which he takes exception to the action of the board in several particulars, but admits he has disregarded the action of the board, and the "request" of the Auditor to extend the taxes upon "the pretended" equalization made by that board, for the reason, that the act of the General Assembly creating the board, is unconstitutional and void, because it undertakes to establish a mode of ascertaining the value of property subject to taxation, in violation of the constitution, and their proceedings were not in conformity with that act, but so far as related to the county of Cook, were an arbitrary imposition of 24 per cent. to the assessed value of property in that county, without any ascertainment of its real or proportionate value, and he

prays the judgment of this court whether he ought to extend such taxes upon such pretended equalization of the property of that county.

To this return the relator demurred, and there was a joinder in demurrer.

The first question for us to determine is, what is the character of this return ?

Writers of authority on the subject of mandamus, recognize three descriptions of return to the alternative writ, namely : traverses, special returns, or those of confession and avoidance, and a statement in the nature of a demurrer to the writ.

This court has often said, that the alternative writ is in the nature of a declaration, and being so, is open to all the modes of pleading applicable to a declaration, and consequently, the allegations of the writ can be traversed, can be confessed and avoided, by setting up facts which go to avoid its effect, or by raising a question of law upon the facts stated in the writ by way of demurrer.

This return traverses no fact alleged in the writ. It confesses none except the refusal to extend the equalized tax, and in justification thereof, alleges the unconstitutionality of the act establishing the board of equalization, so that, without a demurrer by the relator, the whole question involved was fully presented by the return.

It is certainly so, by the demurrer of the relator, and we are called on to decide upon the validity of an act of a co-ordinate department of the government, whose special prerogative it is to enact laws. Such questions, we have repeatedly said, we approach with diffidence and with reluctance, and with a close observance of the principle, that unless the case be a very clear one of constitutional violation, we will uphold the law; and this, not only because the legislature are not to be presumed to have done an act not warranted by the organic law, but because it must be clearly established they have so done.

The small proportion which the actual revenue of the State bore to the real value of the property of the State, under the operation of laws, which, pretending to carry out the behests of the constitution, that all taxes should be levied by valuation, so that every person and corporation should pay a tax in proportion to the value of his or her property, to be ascertained by some person or persons to be elected or appointed in such manner as the general assembly might direct, created wide spread alarm and dissatisfaction, rendering it an absolute necessity that some effective mode should be devised, by which this constitutional provision might be carried out in its true spirit.

The want of such a mode may be well admitted, when the returns of the assessors of the different counties are examined, which were made so late as 1867.

We have extracted from the table accompanying the report of the board of equalization, some startling cases of the gross inequality which prevailed up to the time of the meeting of the board. Reports of the Auditor of Public Accounts, made to the General Assembly in the preceding years, made apparent the same grievances, and that body would have been recreant in their duty if they had not provided a proper correction.

In the county of Cook, the most northerly, as it is the most populous and most wealthy county in the State, horses were assessed in 1867, at an average value of thirty-seven dollars sixty-four cents, cattle at eight dollars thirty-nine cents, mules at thirty-five dollars six cents, sheep at one dollar eleven cents, hogs at one dollar eighty-seven cents, carriages and wagons at thirty-six dollars sixty-nine cents, clocks and watches at twelve dollars seventy-nine cents, pianos at ninety-four dollars ninety-seven cents!

In Alexander county, in the extreme southern part of the State, one of the smallest, least populous, and, outside out of the city of Cairo, least improved counties of the State, horses

43—46TH ILL.

were assessed, the same year, at an average value of fifty-six dollars six cents, cattle at sixteen dollars thirty-nine cents, mules at seventy-seven dollars eighty-one cents, sheep at one dollar eighty-five cents, hogs at one dollar eighty-eight cents, carriages and wagons at thirty-six dollars seventy-three cents, clocks and watches at twenty-one dollars seventy-three cents, pianos at two hundred and fifteen dollars fifty-one cents. These instruments in Lawrence county, on the Wabash river, a third rate county, without any important town, were assessed at two hundred and thirty-one dollars twenty-five cents. In Hamilton, in the same grade of counties, they were assessed at two hundred dollars. In Crawford, also in the same grade, at two hundred and five dollars fifty-six cents; while in Jo Daviess county, with more wealth, greater population, and boasting the city of Galena, they were assessed at twenty-eight dollars seventy-six cents! In Lake, another of our most favored and enterprising counties, upon the lake shore, they were assessed at thirty-two dollars sixty-four cents, and carriages and wagons at less than ten dollars! In Lee, a large and populous county upon Rock river, with several railroads passing through it, and full of wealth and enterprise, they were assessed at a valuation of thirty-five dollars and seventy-five cents, and carriages and wagons at twelve dollars. In Tazewell, one of our largest and wealthiest counties, pianos were assessed at thirty-seven dollars and sixty-two cents.

These gross inequalities pervade the table of assessments; and that also shows, while the property of the southern and eastern counties in the State is assessed at something near its actual value, that of the northern and western and central counties are far below it. These inequalities permeated the whole system, and this wholesome provision of the constitution rendered practically inoperative; and the same was the case with real property.

If the Legislature have no power, under the constitution, to provide a corrective for these monstrous evils, inflicting

injustice upon the individual property owner, and robbing the treasury of the State of its just revenues, then, indeed, it must be conceded it is a feeble instrument, and the sooner it is overhauled and its weak places strengthened, the better.

But these evils, grievous as they are, and even if tenfold greater, furnish no apology to the legislature for a law to correct them, unless such law shall be within their constitutional competency to enact. As we have said in several cases, the framers of our constitution have taken great pains to affirm the principles of equality and uniformity, as indispensable to all legal taxation, whether general or local; and if the act of February 8, 1867, eschews those principles or violates them, it must be condemned, however praiseworthy may have been the object, and however pressing the necessity. The great central idea of the constitution and of its framers, was not a system of revenue based on the valuation of property, but uniformity and equality in the assessment of the tax upon it when valued, so that every person should pay a tax in proportion to it. That is the leading idea. *Bureau Co.* v. *C., B. & Q. R. R. Co.*, 44 Ill. 229.

Is that object infringed upon by the act in question? Has not the valuation of property in Cook county been ascertained by persons appointed by the general assembly? and was not the manner of their appointment an open question with the legislature? How have they proposed, in their various revenue laws, to execute the powers conferred? Whether they have enacted it wisely or not, is not the question; it is a question of power only, and must be tested by the constitution alone.

Keeping in view that the central idea of section 2, article 9, of the constitution is uniformity of taxation, and that exact uniformity is, under no system, practically attainable, an approximation to it is all that can be demanded.

When property is valued by persons appointed or elected for that purpose, the injunction of the constitution is thus far

obeyed. Why are values to be ascertained? So that every person and corporation shall pay a tax in proportion to value. That is the sole object of valuation. How is the fact to be ascertained, that, in levying a tax on this valuation, which every person has been required to pay, is in proportion to its ascertained value? That is the important question.

While it is admitted that it is not practicable to ascertain the precise value of taxable property, and while the real object is to assess all property by the same standard, and as near its real value as is possible under all circumstances, every means the legislature may adopt to arrive at this standard, if not prohibited by the constitution, must be within their constitutional competency.

It may be asked, how shall the value be ascertained by the persons elected or appointed for that purpose? The constitution prescribes no mode. None of the details are found there. The great principle only is announced, that valuation shall be the basis, in order to produce uniformity in results, all else being left to the wisdom of the legislature. Whatever they may do, whatever mode they may prescribe, which does not overleap this boundary, must be legitimate.

It is seriously contended, that the mode prescribed by the eighth section of the act in question is not within this boundary, but outside of it, and consequently null and void.

That section is as follows :

" In equalizing the value of personal property in the several counties said board shall cause to be added together the average values of each kind of domestic animals and enumerated articles in each county, and the sum so obtained as compared with the added general averages of the same items throughout the State, shall be held by said board to indicate the proportion which the whole assessment of personal property in each county bears to the whole assessment of personal property throughout the State, and said personal property shall be equalized by said board in the manner hereinafter provided

for equalizing real property.   Real property shall be equal-
ized by adding to the aggregate assessed value thereof in
every county in which said board may believe the valuation
to be too low, such per centum as will raise the same to its pro-
per proportionate value, and by deducting from the aggregate
assessed value thereof in every county in which said board
may believe the valuation to be too high, such per centum as
will reduce the same to its proper value.   When the relative
valuations of real and personal property shall have been con-
sidered separately, said board shall combine the results in such
manner as may be deemed equitable, and determine a uniform
rate per cent. to be added to, or deducted from, both classes of
property in each county, which rate per cent. shall in all cases
be even and not fractional :   *Provided*, that nothing herein
contained shall be construed as interfering in any manner
with the laws now in force in regard to the equalization of
assessments as between the different townships, by the board
of supervisors in counties adopting the township organiza-
tion."

On this section hinges the argument of respondent's coun-
sel, and rightly so, for by it is developed, fully, the system
designed by the legislature for the purpose of approximating
and carrying out the dominant idea of uniformity.

They say this mode of ascertaining the value of taxable
property conflicts with the constitution, because it adopts a
standard of value as a basis of taxation different from the one
prescribed by the constitution ; and that the General Assem-
bly had no power to provide for an equalization of assess-
ments for any other purpose than to ascertain and fix the true
value of the property assessed.   And they say further, that it
has no authority to equalize the assessments of the several coun-
ties by an arbitrary rule, which must produce great inequali-
ties between the assessment of real and personal property,
and which totally disregards the rights and interests of the
individual tax payer, who alone is affected by it.

This error of the argument is apparent. It proceeds on the assumption that a standard of value has been adopted as a basis of taxation, not recognized by the constitution, and that the legitimate purpose of a board of equalization could only be to ascertain and give the true value, of the property assessed.

Such, we think, was not the purpose. The true value of property, by no system yet devised by the wit of man, can be exactly ascertained. An approximate value having been returned by assessors, it is the clear object of this section so to equalize the valuations among the several counties of the State as to approximate, not to reach, for that is also impracticable, a perfect, but an attainable degree of uniformity, and thus carry out the great and central requirement of the constitution, and this by the application of the doctrine of averages, a doctrine which enters into all kinds of business, into all the complicated affairs of life, and which has received the sanction of the learned and the wise of every civilized nation.

What is the object of this provision in the constitution? The answer is, to raise a revenue for the support of the government. On what shall it be raised? On property. In what manner? By valuing the property of the several counties, through the agency of persons elected or appointed for that purpose. On what principle must the tax be levied? On the principle of uniformity, by which all the citizens of all the counties shall pay a tax, not in precise proportion to the value of their property, but as nearly so as by the application of just principles to the valuation of it will be most likely to produce the desired result.

There is nothing in the constitution expressly prohibiting a revision of valuations and assessments, and that principle has been incorporated into our revenue system by all the revenue laws passed since the adoption of the present constitution.

In counties adopting township organization, ample provision is made for examining the assessment rolls of the differ-

·ent assessors in the several towns of the county, by the Board of Supervisors of the county, in order to ascertain whether the valuation in any one town or district bears just relation to that of all the other towns and districts in the county, and that Board is fully authorized to increase or diminish the aggregate valuation of real estate in any town or district, by adding or deducting such sum upon the hundred as may, ·n their opinion, be necessary to produce a just relation between all the valuations of real estate in the county, but in no instance to reduce the aggregate valuation of all the towns and districts below the aggregate as made by the assessors. Sec. 15, Sess. Laws 1861, page 243.

What is this but a board of equalization on a limited scale? It will not be contended that the County Board of Supervisors are persons elected or appointed for the purpose of valuing property. Not at all. Yet it has never been questioned that the power thus conferred upon it has been legally conferred. It was foreseen at the outset, by the legislature, that in counties having as many assessors as there were towns within it, there would be great discrepancies in the assessments. That common horses, in town A, might be valued fifty or one hundred per cent., or more, above the same description of horses in town B, and even at greater disproportion in town C. What more just and equitable than that power should be reposed somewhere to correct this, and by raising up, or dropping down, or making an average among the several towns, a true valuation might be approximated. The object and purpose of the Board of Equalization is the same, with this difference, that they are required to equalize valuations between the several·counties in the State. They are both parts, and very important parts, of our revenue system, which, inculcating valuation, at the same time does not lose sight of the dominant principle of equality and uniformity. The title of the bill is an act to amend the revenue laws. It is a step in the right direction, and although individual cases of hardship and

injustice may happen under it, when first put in operation, its object and purposes commending it so much to the respect of the people, such cases will not be received as arguments against the validity of the law, or even its policy.

We perceive nothing in the act conflicting with section two. of article nine of the constitution. Some of its details might, no doubt, be improved, as they will be, by future legislation, but the principle on which it is based commends it to our best, judgment. Let a peremptory mandamus issue.

Walker J. dissenting. ,

*Mandamus awarded.*